UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

GINNY SIEVERT,

    Plaintiff,

v.

THE CITY OF SPARKS,

    Defendant.

3:12-cv-0526-LRH-WGC

ORDER

    Before the Court is Defendant the City of Sparks, Nevada's (the "City") Renewed Motion for Summary Judgment. Doc. #48.[1] Plaintiff Ginny Sievert ("Sievert") filed an Opposition (Doc. #52), to which the City Replied (Doc. #53).

**I.    Facts and Background**

    Plaintiff Sievert is an employee of the City and has been employed by the Sparks Fire Department ("SFD") since 1994. Sievert was the City's first female firefighter, and she was promoted to captain in August 2009. Among Sievert's annual performance appraisals before 2011, she received "excellent" or "meets or exceeds minimum standards" grades 279 times, and a grade of "needs improvement" only eight times.

    In October 2011, Sievert was selected to serve on a promotional board to review eight applicants for a promotion to Fire Apparatus Officer ("FAO"). The board consisted of four

---

[1] Refers to the Court's docket number.

members: Sievert, Division Chief Tom Garrison ("Garrison"), Captain Thom Kowatch ("Kowatch"), and Captain James Reid ("Reid").  One of the applicants for the promotion, Firefighter Christopher Jones ("Jones") approached Fire Union leadership with his concern that Sievert could not be impartial to him because of her past negative interactions with Jones.  Jones referenced a number of confrontations between himself and Sievert.  First, Sievert had accused Jones of reporting to work drunk in April of 2008.  Sievert approached Reid with her accusation; Reid concluded that there was no evidence to support the claim.  Second, after Sievert was promoted to captain, she summoned Firefighter Scott Bryant ("Bryant") to a counseling session to discuss deficiencies in his work that she had documented over a four-month period.  Jones served as Bryant's Union representative and concluded the counseling session after Bryant called Sievert a "[expletive] liar," and Sievert threatened to "bury" Bryant with documentation.  Union leadership determined that Sievert could be impartial, and did not disband the board.

　　　　Three of the board members, including Sievert, believed that Jones was qualified for the promotion.  Despite having ranked Jones as qualified for the promotion, however, Sievert brought her prior confrontations with Jones to the attention of the board.  Sievert also told the board about two other incidents that she considered inappropriate and unprofessional.  First, Sievert told the board that she had heard about—though not witnessed—an incident where Jones placed his penis over his wrist watch and asked those around him "does anybody have the time, my watch is broken," thereby causing others to look.  Jones was orally reprimanded for this tasteless and inappropriate action.  Second, Jones made sexually suggestive comments during a holiday party that was attended by firefighters and their families.  Apparently unaware that children were present, Jones announced over the intercom that he was going to show a "tits and ass" video, and that the men should come watch it.  During Jones' interview, the promotional board asked Jones if he had done anything in his tenure with the SFD that he was not proud of, to which he responded no.  By a vote of 3-1, Sievert, Kowatch, and Garrison ultimately decided not to promote Jones based on the concerns raised by Sievert and Kowatch about his immaturity and lack of professionalism.  The

board promoted two other individuals to captain in December of 2010.

Jones subsequently filed a Union grievance against the City for failure to provide an unbiased promotional board. The grievance was submitted to arbitration and the arbitrator issued an award in favor of Jones and against the City. After the award was issued, a captain posted the arbitration decision on the Union website and encouraged people to read it. Sievert complained that the arbitration decision was supposed to be confidential, and that posting the award on the Union website was evidence of hostile work environment and retaliation. Following this incident, Sievert wrote a number of emails to her superiors complaining of discrimination, harassment, and retaliation that was directed toward her as a result of her participation on the promotional board. In response to these complaints, the City hired an attorney to investigate Sievert's claims. The attorney concluded in an October 10, 2011 report that Sievert's claims of harassment, discrimination, and retaliation lacked merit.[2]

Following publication of the attorney report, Sievert's direct supervisor Battalion Chief Carl Blincoe ("Blincoe") stated that he felt "vindicated" of any wrongdoing related to Sievert's claims of harassment and discrimination. Sievert also began to believe that Blincoe, who she considered an ally of Jones, was "gunning" for her. Specifically, Sievert states that Blincoe took direct actions to thwart her professional growth, including delaying completion of her battalion chief Task Book in order to prevent her from obtaining a promotion. On November 11, 2011, Blincoe convened a "special meeting" among captains to discuss Sievert's suitability for leadership and to determine the accuracy of station-wide rumors about her.

In January 2012, Sievert received an unfavorable annual performance review. Specifically, Blincoe rated Sievert as "below expectation" in five of twenty-two categories, including city equipment/vehicle use, judgment, problem solving, interpersonal relations, and execution of policy. The notes section of Blincoe's appraisal specifically mentions that Sievert was "involved with a

---

[2] The City conducted a second investigation of Sievert's claims in April of 2012, and the independent investigator again concluded that Sievert's claims lacked merit.

grievance concerning the FAO promotional interview process." Sievert believed that the 2011 appraisal was unfair, and appealed the decision to Chief Flock. On August 15, 2012, Chief Flock concluded that the 2011 appraisal was largely justified, and went further to address some of his own concerns about Sievert's professionalism, lack of respect for authority, and interpersonal issues.

On March 8, 2012, Sievert filed a formal complaint for gender discrimination and retaliation with the EEOC and received a "Right to Sue" letter in June 2011. Subsequently, on September 27, 2012, Sievert filed a Complaint against the City alleging two causes of action: (1) Title VII gender discrimination; and (2) Title VII retaliation. Doc. #1. Sievert filed an Amended Complaint on November 8, 2012. Doc. #13. Thereafter, the City filed its first Motion for Summary Judgment. Doc. #26. The Court granted the City's Motion as to Sievert's Title VII gender discrimination claim, and granted leave for the parties to submit additional briefing regarding Sievert's Title VII retaliation claim. The City filed its Renewed Motion for Summary Judgment on April 22, 2014.

**II.   Legal Standard**

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.,* 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could

find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1141 (C.D.Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J,* 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at 252.

In determining whether to grant or deny summary judgment, it is not a court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotation marks omitted). Rather, a court is entitled to rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment." *Id.*

**III.    Discussion**

Title VII prohibits retaliation by making it unlawful "for an employer to discriminate against any of [its] employees . . . because [she] has opposed any practice that is made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Courts employ the burden-shifting framework articulated by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to analyze claims of retaliation under Title VII. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034-35 (9th Cir. 2006). First, the plaintiff has the burden to establishing a *prima facie* case of retaliation. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff meets this burden, then the defendant must "articulate some legitimate, nondiscriminatory reason" for the alleged retaliatory

action. *Id.* If the defendant does so, then the burden shifts back to the plaintiff to show that defendant's asserted nondiscriminatory reason for the challenged act was "mere pretext." *Id.* at 804. While the *McDonnell Douglas* analysis involves a shift in the burden of *proof*, the "plaintiff retains the burden of *persuasion*" throughout. *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (emphasis added).

### A. *Prima Facie* Case of Retaliation

To establish a *prima facie* case of retaliation, a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action, and (3) a causal link between the two. *Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004).

#### 1. Involvement in a Protected Activity

Sievert argues that her actions are protected under both the "participation clause" and the "opposition clause" of 42 U.S.C. § 2000e-3(a). The opposition clause prohibits an employer from retaliating against an employee because she "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). The participation clause prohibits an employer from retaliating against an employee because he has "participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.*

An employee's claim that the employer engaged in employment discrimination "virtually always" constitutes a valid opposition to the employer's activity under § 2000e-3(a). *Crawford v. Metro. Gov't of Nashville and Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009). To establish a valid opposition, a plaintiff need not launch the investigation, but "can oppose by responding to someone else's question just as surely as by provoking the discussion." *Id.* at 277. "[A] plaintiff does not need to prove that the employment practice at issue was in fact unlawful under Title VII." *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994). Rather, the plaintiff need only "show that she had a 'reasonable belief' that the employment practice she protested was prohibited under Title VII" to establish involvement in a protected activity for a *prima facie* case under the opposition clause. *Id.*

6

The City argues that Sievert never engaged in an opposition activity because she "independently ranked Jones high enough for promotion and then chose to support a candidate that she had rated slightly higher to fill the final open position." Doc. #48 at 26. The City adds that "it was Captain Kowatch, *not Sievert*, who actually used Jones's prior immature behavior as a justification for denying Jones a promotion in 2010." *Id.* Even if it were Sievert who brought Jones' sexually explicit conduct to the board's attention, the City argues that Jones' "participation in practical jokes, . . . horseplay with other men, . . . and a single off-color comment . . . are not severe enough to trigger the protections of Title VII." *Id.* at 28; *see Manatt v. Bank of Am.*, 339 F.3d 792, 798 (9th Cir. 2003) ("Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."); *Candelore v. Clark Cnty. Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992) (finding that "isolated incidents of sexual horseplay . . . were not so egregious" to establish a *prima facie* case of hostile work environment).

Sievert argues that she has established involvement in a protected activity under the opposition clause because she had a reasonable belief that imparting her knowledge of Jones' "illegal, immature, and sexually inappropriate conduct to the board was a 'protected activity' under Title VII." Doc. #52 at 24. Sievert states that she knew that this information about Jones' conduct would reflect poorly on him, and that he would learn that she brought this information to the board's attention. Sievert still disclosed the information, however, "because she knew that what Jones had done was not right and that it mattered in the board's investigation of the candidates." *Id.* After the board decided not to promote Jones, he filed a grievance and an arbitrator found for Jones after determining that the board was biased against him. Another captain published the arbitrator's findings on the Union's website, allowing all members of the Union to see that Sievert directly contributed to the board's decision not to promote Jones. Sievert argues that she believed that posting the arbitrator's decision was done "in an effort to humiliate Sievert, to vindicate Jones, and because of disapproval of a woman in a position of authority." *Id.* at 25. Accordingly, Sievert

7

"accused the City and SFP command staff of discrimination, harassment (hostile work environment), and retaliation." *Id.* The City investigated Sievert's claims and determined that they were unfounded. *See* Doc. #52, Ex. 5. Regardless of this finding, Sievert argues that her allegations that the City's acts were prohibited by Title VII constituted a protected activity under the participation clause because she had "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. *Id.* (quoting 42 U.S.C. § 2000e-3(a)).

The participation clause is meant "to protect the employee who utilizes the tools provided by Congress to protect his rights." *Vasconcelos v. Meese*, 907 F.2d 111, 113 (9th Cir. 1990). "The participation clause therefore applies only to EEOC proceedings." *Snider v. Greater Nev., LLC*, No. 3:07-cv-0583, 2009 WL 3319802, at *15 (D. Nev. Oct. 14, 2009). Accordingly, the City is correct that Sievert's participation in the internal investigation following her claims regarding the posting of the arbitrator's decision on the Union website do not support a *prima facie* case of retaliation under the participation clause because no EEOC proceeding had yet been filled.

Although Sievert presented her claims for discrimination and retaliation based on the SFD captain's decision to publish the arbitrator's decision on the Union website as a participation clause issue, the Court analyzes her actions in response to this incident under the opposition clause. In the context of employment discrimination and retaliation actions under the opposition clause, the Supreme Court defines "oppose" as "to resist or antagonize . . .; to contend against; to confront; resist; withstand." *Crawford*, 555 U.S. at 276 (quoting Webster's New International Dictionary 1710 (2d ed. 1958)). A plaintiff's claim that the employer engaged in employment discrimination "virtually always" constitutes a valid *opposition* to the employer's activity under § 2000e-3(a). *Id.* "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the

//

//

8

employee."[3]  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).  The Court therefore finds that Sievert's opposition to Jones' promotion, and her claims of discrimination and retaliation were protected activities under 42 U.S.C. § 2000e-3(a).  *See Walker v. Venetian Casino Resort, LLC*, No. 2:10-cv-0195, 2012 WL 4794149, at *6 (D. Nev. Oct. 9, 2012) ("Protected activities include company-internal complaints about discrimination.").

### 2. Adverse Employment Action

An adverse employment action is any employer action that could "dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  The Ninth Circuit has held that "a wide array of disadvantageous changes in the workplace constitute adverse employment actions."  *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).  "Transfers of job duties and *undeserved performance ratings*, if proven, would constitute 'adverse employment actions'" cognizable under 42 U.S.C. § 2000e-3(a).  *Id.* at 1241 (emphasis added) (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)).

Sievert alleges two primary adverse employment actions: (1) the negative 2011 performance appraisal by Blincoe and 2012 commentary letter by Chief Flock; and (2) Blincoe's intentional delay in completion of Sievert's battalion chief Task Book to prevent Sievert from taking the 2011 promotional exam.  The City argues that the negative reviews cannot constitute adverse employment actions because they are valid assessments of her job performance.  The City also argues that delay in taking the promotional exam is not an adverse employment action because it does not impact her employment in a tangible way: "her pay grade is not increased or decreased based on the test, her duties are not changed, her job, responsibilities, and expectations against which her performance is evaluated remain the same."  Doc. #48 at 33.  The City adds that because

---

[3] Employers can raise an affirmative defense to such claims, but no such defense is available "when the supervisor's harassment culminates in a tangible employment action" against the employee.  *Burlington Indus., Inc.*, 524 U.S. at 765.

9

Sievert cannot know whether she would have passed the test or actually received the promotion, these claims "are simply too tenuous to conclude that Sievert's employment was materially affected by delay in the task book process." *Id.*

Sievert has produced evidence that nearly every year prior to 2011 she received very positive performance reviews, and that Sievert's only significantly negative review occurred in 2011, after Sievert contributed to the decision not to promote Jones and accused her superiors of discrimination and retaliation. Importantly, Chief Flock acknowledged that Blincoe's review was negative, and that such a review "would have an impact" on the SFD's decision on whether to promote Sievert. Doc. #52, Ex. 10 at 63:19, 64:7.

Negative performance reviews fall squarely within the broad category of employer actions that the Ninth Circuit considers adverse. *See Ray*, 217 F.3d at 1241. The Court therefore finds that a reasonable jury could find that Sievert did not deserve the negative review, and that Sievert has met her burden to establish the existence of an adverse employment action for the purposes of showing a *prima facie* case of retaliation. *See Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) ("Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion.")[4]; *Walker*, 2012 WL 4794149, at *8 (finding that a plaintiff's retaliation claim established a genuine dispute of material fact because plaintiff's negative performance rating constituted an adverse employment action and supported her *prima facie* case of retaliation).

//

---

[4] In *Brooks*, the court ultimately held that the negative performance review at issue was not an adverse employment action because "it was subject to modification by the city." 229 F.3d at 929. There, Brooks appealed the review but quit her job while the appeal was pending. *Id.* The court concluded that "[b]ecause the evaluation could well have been changed on appeal, it was not sufficiently final to constitute an adverse employment action." *Id.* Here, by contrast, Sievert appealed her negative review, the review was upheld by Chief Flock, and Chief Flock wrote additional observations about Sievert's job performance that could also be considered negative.

10

### 3.     Causal Link

To establish the causation element of the *prima facie* case of retaliation, "the plaintiff must present evidence sufficient to raise the inference that her protected activity was likely the reason for the adverse action." *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).  "The causal link may be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011) (citation omitted).  Many courts hold that a plaintiff can establish the causation prong "simply by showing that the adverse employment action occurred within a short time after the protected conduct," *Crawford*, 555 U.S. at 283, but this "temporal proximity must be very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).

The City argues that Sievert has failed to establish a causal connection because many of the actions that Sievert claims were retaliatory occurred before the arbitrator's decision and subsequent publication of Sievert's negative statements about Jones on the Union's website.  The City adds that despite Sievert's claim that Blincoe delayed action on Sievert's task book after she accused Blincoe and the SFD of discrimination, the record indicates that Blincoe continued to be supportive of Sievert's development through 2012, and in fact, Blincoe signed off on significantly more tasks following her accusations than before.

Sievert argues that the causal connection is "plainly clear" because she had received near universally positive appraisals before 2011, but her first appraisal following the arbitrator's report and her accusations against Blincoe and the SFD was largely negative.  In fact, Sievert alleges that nearly every problem that Blincoe identified in the 2011 appraisal occurred after the Jones arbitration and her accusations of discrimination and retaliation.  Additionally, Blincoe called a meeting of the captains in August of 2011—when Sievert was on vacation—to discuss incidents related to Sievert's job performance and interpersonal relations.  Blincoe stated that he wanted to hear rumors about Sievert and to learn whether they were substantiated.  Doc. #48, Ex. 34 at 61:9-

11

13. Sievert alleges that Blincoe assigned her additional tasks beginning in September, 2011, and that he included minor infractions in her 2011 appraisal that were not included in reviews of captains involved in similar incidents. *See* Doc. #48, Ex. 33 at 84:6-10.  Finally, after a shift trade confusion, Blincoe wrote to a superior that he did not think Sievert was "even close to having the competency to be an acting BC," and that he refused "to work with her on her BC task book unless ordered to do so." Doc. #52, Ex. 11.

       The Court finds that Sievert has sufficiently established that her protected activities caused the alleged adverse employment actions.  The City's own chronology of the events following the Jones promotional board incident indicates that many of the infractions cited in her negative 2011 appraisal occurred after information about the decision not to promote Jones was disseminated to the Union in the arbitrator's report, and after Sievert accused the department of discrimination and retaliation. *See* Doc. #48 at 35-36.  Furthermore, Blincoe acknowledged that he gave Sievert additional tasks to complete prior to being eligible for promotion that were not normally required for captains. Doc. #52, Ex. 2 at 129:14-21.  The timing of Sievert's adverse employment action—after her allegations of discrimination and publication of her statements about Jones—is sufficient to establish a causal connection between her protected activity and the adverse employment action. *See Yartzoff*, 809 F.2d at 1376 (stating that causation "may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision"); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000) ("[W]here adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred.").

       Whether the negative review and delayed promotion was justified must be considered not in relation to Sievert's *prima facie* case, but rather in the discussion of whether the City had a legitimate, nondiscriminatory reason for the adverse employment action.  Accordingly, the Court finds that Sievert has met her burden to allege a *prima facie* case of retaliation to survive the City's

Motion for Summary Judgment at this stage of the analysis.

### B. Legitimate, Nondiscriminatory Reason

Because Sievert has established a *prima facie* case of discrimination, the burden shifts to the City to articulate a legitimate, nondiscriminatory reason for the employment actions. *McDonnell Douglas*, 411 U.S. at 802. The Court finds that the City has met its burden. The 2011 performance appraisal rated Sievert as "below expectations" in five of twenty-two categories, noting specific examples of misconduct and a perceived inability to take responsibility for her actions. *See* Doc. #48, Ex. 57. In particular, the report referred to an incident where Sievert failed to load the hose on her truck properly, and that she spent too much time on personal tasks while on the job. *Id*. Sievert does not argue that these events did not occur, but merely states that they were insignificant infractions, and that inclusion of the incidents in the performance appraisal was pretext for retaliation because such incidents normally would not be included in a performance report. Doc. #52 at 31.

The Court finds that it is appropriate for a fire department to include the concerns cited in the 2011 performance appraisal in a performance review, and even potentially to delay promotion. *See Burdine*, 450 U.S. at 257 ("[T]he employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."). As an example, there is no serious dispute that an improperly loaded hose on a fire truck could endanger the lives of fire fighters and others that they are charged with protecting, and that such an incident would properly be included on a performance review. Additionally, this was not the first time that Sievert's interpersonal problems delayed a promotion. *See* Doc. #48, Ex. 23 at COS000007 (noting that Sievert's probationary period was extended by three months for exercising bad judgment in interactions with firefighters). Accordingly, the City has met its burden to establish articulate legitimate, nondiscriminatory reasons for Sievert's asserted adverse employment action.

//

13

**C. Pretext**

A plaintiff can show that an employer's purported legitimate, nondiscriminatory explanation for an employment action was merely pretext for retaliation directly by establishing that retaliation "more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256. "[A] plaintiff at the pretext stage must produce evidence in addition to that which was sufficient for her prima facie case in order to rebut the defendant's showing." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). When a plaintiff proffers circumstantial evidence of pretext, this evidence "must be 'specific' and 'substantial' in order to create a triable issue with respect to whether" the employer's justifications are pretext for discrimination or retaliation. *Id.* at 1222. If the same actor is responsible for the adverse employment action but also equivalent positive employment actions, "and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996).[5] If the evidence shows that there may be both legitimate and illegitimate reasons for an adverse employment action, "the jury should be instructed to determine first whether the discriminatory reason was 'a motivating factor.'" *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1067 (9th Cir. 2003) (quoting *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 856-57 (9th Cir. 2002)).

In *Stegall*, the plaintiff presented significant circumstantial evidence that defendant's stated reasons for her termination were mere pretext for retaliation: (1) she was fired nine days after filing a discrimination complaint; (2) she had a "tumultuous" relationship with her superior, who at least once "denigrated her based on her gender"; and (3) the employer's statements about her "negative

---

[5] Some courts hold that the "same actor" analysis does not apply to retaliation claims where the plaintiff's protected action occurred after the actor's positive action but before the negative action, thereby creating animus resulting in retaliation. *See, e.g.*, *Heuer v. City and Cnty. of S.F.*, No. 09-5331, 2011 WL 5520955, at *8 n.14 (N.D. Cal. Nov. 14, 2011) (noting that the "same actor inference" did not apply because the protected action occurred in the three years between the employer's positive and negative actions, and thereby "created animus"). The same actor inference applies here, however, because Blincoe's positive and negative actions occurred in close proximity to each other, and positive actions occurred after Sievert's protected actions.

14

attitude" were "unworthy of credence." 350 F.3d at 1068-71. The Ninth Circuit held that this circumstantial evidence was "sufficient to raise a genuine issue of material fact because it demonstrate[d] that an illegitimate reason more likely motivated [defendant], or at least was a motivating factor in [plaintiff's] dismissal." *Id.* at 1068.

Sievert similarly relies on circumstantial evidence to support her claim that the City's stated reasons for the negative appraisal and delayed promotion were pretextual. First, Sievert notes that despite receiving almost exclusively positive reviews prior to the Jones incident, the next review after her protected conduct was negative. Second, Sievert states that after her participation on the Jones board became known, Blincoe, "who had previously been encouraging to her career, was now explaining to her superiors that he was no longer willing to work with her, he would not participate in her Task Book signoffs, and that she was lacking competence" for a promotion. Doc. #52 at 31. In addition to the timing of these incidents, Sievert refers to circumstantial evidence of the SFP's pattern of discipline for other officers to support her pretext argument. First, Jones was never disciplined for his sexually inappropriate behavior. Second, another captain also involved in the August 2011 "shopping incident" for which Sievert was counseled was not written up or disciplined in any way. Third, Blincoe acknowledged that no other captains received comments that were unrelated to the objective categories in their annual evaluations. Sievert argues that Blincoe only included such statements in her appraisal because, in the words of the appraisal, she was "involved with a grievance concerning the FAO promotional interview process." Doc. #48, Ex. 57 at COS002260.

It is important to note that although Sievert was rated as "below expectations" in five of twenty-two categories in the 2011 appraisal, and the City acknowledges that this was a negative assessment, the review was not exclusively negative. Sievert was rated as "meets expectations" in thirteen categories, and "exceeds expectations" in three categories. *See id.*, Ex. 57. In particular, Sievert was praised for her work ethic, initiative, and contribution to special assignments. *Id.* Additionally, the 2011 appraisal was not the first time that supervisors were critical of Sievert.

15

Sievert's 2010 appraisal, while exceedingly more positive than her 2011 appraisal,[6] rated Sievert as "needs improvement" in the judgment category because she "exercised poor judgment during an employee counseling session." *Id.*, Ex. 23 at COS000007. As a result, Blincoe extended Sievert's promotion probationary period by three months. *Id.* Finally, the City has identified numerous instances where Sievert's appraisals discussed her lack of tolerance for others, juvenile behavior and disrespect for superiors, difficulty maintaining strong working relationships, and ability to cope with frustrating situations. *See id* at 42-43.

The Court finds that Sievert has not met her burden to establish that the City's proffered nondiscriminatory reason for the negative performance review was pretext for retaliation. Sievert's history of mostly positive reviews before 2011 is unavailing. *See Pottenger v. Potlatch Corp.*, 329 F.3d 740, 746 (9th Cir. 2003) (finding that positive comments on a performance review did not rebut the employer's nondiscriminatory justification because the review "also contained negative comments specifically singling out concerns" related to the legitimate reason for the employment action); *Massucco v. Grp. Health Co-op.*, 255 Fed. Appx. 129, 132 (9th Cir. 2007) (noting that past positive performance reviews did not rebut the employer's legitimate reasons for the employment action because the positive reviews occurred before the conduct that led to the employment action).

Sievert also argues that the City's nondiscriminatory explanation for her delayed promotion[7] is pretextual because in December of 2011, three months after Sievert accused Blincoe of discrimination and retaliation, he refused to help with her task book unless ordered to do so. Doc. #52 at 31. The City notes, however, that the "sign-off rate in Sievert's promotional task book *increased* after she accused Blincoe of discrimination." Doc. #48 at 42; *see id.*, Ex. 25. Sievert completed her task book with Blincoe's help on July 12, 2012, only three months later than

---

[6] Sievert was rated as "meets or exceeds minimum standards" in sixteen of seventeen categories, and "needs improvement" in only one category. Doc. #48, Ex. 23.

[7] Although Sievert had fulfilled the experience requirements to be eligible for the November 14, 2011 promotional exam, she had not yet finished her task book, and was therefore not eligible for this exam. Doc. #48 at 16-17.

16

expected.[8]  Doc. #48 at 43.  Sievert has since accumulated some time as acting battalion chief, and states that she has been treated well by other captains and firefighters in the SFD.  *Id.*, Ex. 4 at 423:9-15.  Sievert adds that much of the tension from her past interactions with Jones and the SFD has "gone away."  *Id.*, Ex. 4 at 423:25-424:1.  At this point, in order to be promoted to the role of battalion chief, Sievert must pass the promotional exam and then sit for an interview.  *Id.*, Ex. 4 at 371:11-14.  Sievert sat for the November 2013 promotional exam but failed.  *Id.* at 21.

Although the timing of Sievert's first primarily negative performance review—after her involvement in the promotional board and accusation of discrimination against the SFD—appears suspicious, Sievert has not met her burden to establish with specific and substantial evidence that the City's stated reasons for the negative review were merely pretext for retaliation.  As this is an essential element of a retaliation claim under Title VII, the Court must grant the City's Motion for Summary Judgment.  *See Cornwell*, 439 F.3d at 1034-35.

**IV.    Conclusion**

IT IS THEREFORE ORDERED that the City's Renewed Motion for Summary Judgment (Doc. #48) is GRANTED.

IT IS FURTHER ORDERED that Sievert's Motion to File Excess Pages (Doc. #51) is GRANTED.

IT IS FURTHER ORDERED that the clerk shall enter judgment in favor of the City and against Sievert.

IT IS SO ORDERED.

DATED this 4th day of February, 2015.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

---

[8] Blincoe notes that this amount of lateness is not unheard of, and that task books are sometimes completed much later than three months after the expected completion date.  Doc. #52, Ex. 2 at 51:9-19.